# **<u>EXHIBIT A</u>**

1  SHELLY D. McMILLAN, SBN 136618
   MATTHEW B. HERRELL, SBN 146242
2  McMILLAN & HERRELL
   8383 Wilshire Boulevard, Suite 363
3  Beverly Hills, California 90211
   Telephone: (323) 951-0060
4  Facsimile: (323) 951-0061

5  Attorneys for Plaintiffs,
   BRIAN CALDRONE, GALIA WILLIAMS,
6  JOSEPH CELUSTA, AND KATHLEEN STAATS

**FILED**
Superior Court of California
County of Riverside
**12/22/2020**
J. Hendrickson
Electronically Filed

7

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                     FOR THE COUNTY OF RIVERSIDE

11 BRIAN CALDRONE, an individual, ) CASE NO. **CVRI2000635**
   GALIA WILLIAMS, an individual, ) _____
12 JOSEPH CELUSTA, an individual, )
   KATHLEEN STAATS, an individual,) **COMPLAINT FOR DAMAGES FOR:**
13                                 )
                                   ) **1.   Age Discrimination (FEHA);**
14          Plaintiffs,            ) **2.   Age Discrimination (ADEA);**
                                   ) **3.   Hostile  Work  Environment**
15   vs.                           )      **(FEHA);**
                                   ) **4.   Hostile   Work   Environment**
16                                 )      **(ADEA);**
   CIRCLE K STORES, INC., a Texas ) **5.   Retaliation (FEHA);**
17 Corporation; CROSSAMERICA       ) **6.   Retaliation (ADEA);**
   PARTNERS, LP, a Delaware        ) **7.   Violation of Public Policy;**
18 Limited Partnership; and DOES 1 )
   through 100, inclusive,         )
19                                 ) **JURY TRIAL DEMANDED**
                                   )
20          Defendants.            )
   _____)

21

22          Plaintiffs, Brian Caldrone, Galia Williams, Joseph

23 Celusta, and Kathleen Staats allege, on information and belief, as

24 follows:

25

26

27

28

                                                    _____
                                                    COMPLAINT

## NATURE OF THE CASE

1.  Plaintiffs bring this action seeking damages and any other available legal or equitable remedies resulting from the actions of Circle K Stores, Inc., and CrossAmerica Partners, LP, in the knowing and intentional discrimination against Plaintiffs on the basis of their age, retaliation, and other unlawful actions against each Plaintiff as set forth herein.

## **THE PARTIES**

2.  Plaintiff, Galia Williams ("Williams"), is, and at all relevant times mentioned in this complaint was, an individual domiciled in the County of Los Angeles, California. Ms. Williams has exhausted her administrative remedies and complied with the statutory prerequisites of filing an age discrimination complaint by filing timely discrimination complaints against Circle K Stores, Inc., and CrossAmerica Partners, LP, with the U.S. Equal Employment Opportunity Commission ("EEOC") and the California Department of Fair Employment and Housing ("DFEH"). Williams has received Right-to-Sue letters from the EEOC and DFEH and is timely filing this complaint, and the discrimination claims herein, pursuant to the Age Discrimination in Employment Act of 1967 (the "ADEA") and the California Fair Employment and Housing Act, Cal. Govt. Code. § 12940, et. Seq. (the "FEHA").

3.  Plaintiff, Joseph Celusta ("Celusta"), is, and at all relevant times mentioned in this complaint was, an individual domiciled in the County of Lucas, Ohio. Celusta has exhausted his administrative remedies and complied with the statutory prerequisites of filing an age discrimination complaint by filing

1

discrimination complaints against Circle K Stores, Inc., and CrossAmerica Partners, LP, with the DFEH, the EEOC, and the Ohio Civil Rights Commission. Celusta has received Right-to-Sue letters from the EEOC and DFEH and is timely filing this complaint and the ADEA and FEHA claims herein.

4.   Plaintiff, Brian Caldrone ("Caldrone"), is, and at all relevant times mentioned in this complaint was, an individual domiciled in the County of Orange, Florida. Mr. Caldrone has exhausted his administrative remedies and complied with the statutory prerequisites of filing an ADEA complaint by filing timely discrimination complaints against Circle K Stores, Inc. and CrossAmerica Partners, LP, with the EEOC and the DFEH. Mr. Calderonn has received right to sue notices from the EEOC and DFEH and is timely filing this complaint and the ADEA and FEHA claims herein.

5.   Plaintiff, Kathleen Staats ("Staats"), is, and at all relevant times mentioned in this complaint was, an individual  an individual domiciled in the County of Palm Beach, Florida. Stats has exhausted her administrative remedies and complied with the statutory prerequisites of filing an ADEA complaint by filing timely discrimination complaints against Circle K Stores, Inc., and CrossAmerica Partners, LP, with the EEOC and the DFEH. Stats has received Right-to-Sue letters from the EEOC and DFEH and is timely filing this complaint and the ADEA and FEHA claims herein.

6. Defendant, Circle K Stores, Inc. ("Circle K"), is, and at all times mentioned herein was, a Texas Corporation with its Principal place of business located at 1130 W. Warner Road, Building B, Tempe, Arizona 85284 and doing business in California from its offices located at 255 E Rincon, Suite 119, Corona, California

2

92879. Circle K is owned, controlled and operated by Alimentation Couche-Tard ("Couche-Tard") which is a Canadian multi-national convenience store and service station operator with extensive operations throughout the United States, Canada, and internationally. At all pertinent times, Circle K has had over 500 employees in the United States.

7. Defendant, CrossAmerica Partners, LP ("CAPL"), is, and at all times mentioned herein was, a Delaware limited partnership, with its principal place of business located at 600 Hamilton Street, Suite 500, Allentown, Pennsylvania 18101. CAPL is a wholesale distributor of motor fuels and an owner and lessor of real estate used in the retail distribution of motor fuels. As part of Couche-Tard's acquisition of CST Brands, Inc. in July 2017, Couche-Tard acquired 100% of the membership interests of CrossAmerica GP LLC, the general partner of CAPL, 100% of the incentive distribution rights in CAPL, and approximately 6.9 million of CAPL limited partner units. As a result, CAPL's general partner became a wholly owned subsidiary of Couche-Tard and Couche-Tard took over control of the business and operations of CAPL. Couche-Tard owned, controlled and operated CAPL from July, 2017, through November 19, 2019, when Couche-Tard sold its interest in CAPL to a group controlled by Joe Topper who had founded CAPL (then known as Lehigh Gas Partners) years before. At all pertinent times, CAPL has had over 500 employees in the United States.

8. Williams, Celusta, Caldrone, and Staats are referred to collectively herein as "Plaintiffs."

9. Defendants Circle K and CAPL are referred to collectively herein as "Defendants." During the period from August 2017 through

3

1  November 2019 when Couche-Tard owned, controlled and operated both
2  Circle K and CAPL, Defendants operated as a single business entity,
3  providing direction and management of Plaintiffs during their
4  employment with Defendants. During the period from August, 2017,
5  through November, 2019, each plaintiff worked for Defendants and,
6  though their paychecks contained Circle K's insignia, their work was
7  controlled by CAPL's CEO, Gerardo Valencia and Vice President of
8  Operations George Wilkins. During this period, Defendants jointly
9  controlled Plaintiffs' wages, benefits, pay periods, hours of work,
10 and working conditions. During this period, management of both
11 companies determined at which sites Plaintiffs would work. As such,
12 both Circle K and CAPL are employers jointly and severally liable
13 for the claims and damages alleged in this complaint.

14      10. Each Plaintiff is unaware of the true names and
15 capacities of defendants sued herein as Does one (1) through one
16 hundred (100), inclusive, and sues these defendants under such
17 fictitious names. Plaintiffs will seek leave of court to amend this
18 complaint to name such defendants when their true names and
19 capacities have been ascertained. Each Plaintiff is informed and
20 believes, and on that basis alleges, that each of the fictitiously
21 named defendants is in some manner responsible for the acts and
22 omissions herein alleged.

23      11. Each Plaintiff is informed and believes, and thereon
24 alleges, that at all times herein mentioned, each of the defendants
25 herein was the agent, or servant, or licensee, or employee, or alter
26 ego, of each of the remaining defendants, and was at all times
27 herein mentioned acting within the course and scope of said
28 relationship. From August, 2017, through November 19, 2019, Circle

4

K and CAPL were owned and operated by the same shareholder, Couche-Tard, and operated as a single business enterprise at times exchanging or combining their assets and operations in the conduct of their convenience store and fuel business. This merger of operations and shuffling of assets was part of Couche-Tard's plan to turn Circle K into a new global convenience brand that incorporated virtually all of its existing convenience store brands. Defendants Circle K and CAPL had interlocking directors and officers who were appointed by and controlled by Couche-Tard. Circle K and CAPL operated from the same business locations in California and around the United States, including convenience store and fuel locations in Los Angeles County and Riverside County. Circle K and CAPL operated using the same shared pool of property, assets, facilities, suppliers, and employees as well as sharing the same customers and business opportunities.

12. Each Plaintiff is further informed and believes, and thereon alleges, that at all times herein mentioned, each business or corporate entity, through its officers, directors and managing agents, and each individual defendant, had advance knowledge of the wrongful conduct of said agents, servants, licensees, employees and alter egos, and allowed said wrongful conduct to occur and continue to occur, thereby ratifying said wrongful conduct, with a conscious disregard of the rights and safety of persons such as Plaintiffs, and after becoming aware of their wrongful conduct, each corporate defendant by and through its officers, directors and managing agents, and each individual defendant, authorized and ratified the wrongful conduct herein alleged.

\\\

5

**FACTUAL BACKGROUND**

13. Plaintiff, Brian Caldrone, began his employment with Circle K in or about March, 2017.  Mr. Caldrone is 55 years old. Plaintiff, Galia Williams, began her employment with Circle K on or about September 2, 2014. Ms. Williams is 54 years old. Plaintiff, Joseph Celusta, began his employment with Circle K in or about September, 2013, and is 56 years old. Plaintiff, Kathleen Staats, began her employment with Circle K in or about April, 2010, and is 57 years old. Each Plaintiff was employed by Circle K as a Dealer Business Manager ("DBM").

14. The duties and responsibilities of Dealer Business Managers were to counsel station operators on retailing factors in the industry, including competitive pricing, customer service, retail facility appearance and cleanliness, to assist station operators in managing their business, improving their bottom lines and maintaining compliance with brand and image requirements, and to guide station operators on management functions including employee selection and training, money management, and inventory management. DBMs also may conduct surveys of competitive retail prices throughout the territory and evaluate trends and market conditions, recommend retail adjustments and strategies within company guidelines, provide support for the development of ancillary profit centers (such as convenience stores, marts, snack shops, service bays, car washes, and joint ventures), monitor physical conditions of the stations to ensure proper maintenance, and ensure station operator compliance with franchise agreement obligations and laws related to environmental record keeping and safety standards. DBMs were also may verify station monthly CSLD testing compliance, and

6

ensure compliance with federal, state and local legal requirements
and assist with investigation and resolution of customer complaints.
DBMs also worked to coordinate sales, marketing, and merchandising
of company products, and worked to build operator buy-in and
compliance with corporate and supplier brand programs. DBMs also may
review P&L and other reports to maximize territory profitability and
cash flow and to ensure financial stability of station operators and
Circle K, and may develop, execute, and maintain territory business
plans, evaluate performance data, and provide action plans to the
Regional Operations Director. DBMs may generate yearly budgets and
review the profitability of their sites and the attainment of both
quantitative and qualitative territory performance objectives. DBMs
may also solicit new business opportunities in their territories,
and may develop and negotiate new account proposals, among other
duties.

15. In or about August, 2017, after Couche-Tard became the
owner and operator of both Circle K and CAPL, Plaintiffs, along with
other managers and employees of Circle K and CAPL were called to a
meeting at the Allentown, Pennsylvania offices of CAPL where they
were informed that the operations of Circle K and CAPL were being
merged. Thereafter, and through November 19, 2019, while Couche-Tard
owned, operated and controlled both Circle K and CAPL these two
subsidiary companies were operated by Couche-Tard as a single
entity. During this time, Circle K managed the overall operations of
the two entities (Circle K and CAPL) and assets and employees were
moved and transferred freely among the companies as they were
treated as a single business unit controlled by Couche-Tard as the
owner.

7

16. From August, 2017 through November, 2019, At all relevant times mentioned herein, Defendants both directly and indirectly employed each Plaintiff and exercised control over each Plaintiff's wages, hours of work, and working conditions by, among other things, exercising power, authority and control in supervising each Plaintiff's day-to-day work and other relevant day-to-day aspects of the workplace behavior of Plaintiffs at each site managed by Plaintiffs.

17. As part of the merger of Circle K and CAPL, in December, 2018, Couche-Tard, Circle K and CAPL began an asset exchange wherein Circle K and CAPL shuffled the ownership of 265 sites in a series of six transactions planned to take place over a 2-year period. To accomplish the asset exchange between Circle K and CAPL dealers needed to be found for the Circle K sites being transferred to the books of CAPL, therefore, it was agreed that the Circle K properties being transferred would remain under management of Circle K until dealers were located and there would be a transition period during which both Circle K and CAPL managed the exchange properties. In November, 2019, while these properties were being shuffled around in this initial exchange, Couche-Tard sold CAPL to Dunne Manning Partners LLC ("DMP"), a group controlled by Joe Topper.

18. In November, 2019, when DMP purchased CAPL, Circle K and CAPL entered into an additional asset exchange agreement (exchanging certain convenience store properties and other assets for limited partnership units of CST Fuel Supply). When DMP purchased CAPL, Circle K and CAPL entered into a Transitional Omnibus Agreement pursuant to which it was agreed that Circle K would provide CAPL with management, administrative and operating services and CAPL

8

would continue to provide Circle K with certain administrative and operational services. Among the management services provided by Circle K was the hiring and firing of persons who would be employed to manage the properties CAPL would acquire from Circle K pursuant to the two asset exchange agreements. Pursuant to these agreements, Plaintiffs worked under the direction and supervision of both Circle K and CAPL managers for so long as they were employed by Defendants after the DMP purchase of CAPL (the management services provided by Circle K continued through, approximately, the third quarter of 2020).

19. After DMP purchased CAPL, Caldrone, Celusta, and Staats were jointly employed by Circle K and CAPL during the exchange period required by the second asset exchange agreement. After DMP purchased CAPL, though Calderon, Celusta, and Staats received direct deposits of pay from CAPL, Circle K managers directed and supervised their work during the second exchange period (which took place from January 1, 2020 through approximately, the third quarter of 2020). During this second exchange period, the work of Caldrone, Celusta, and Staats included the job of preparing exchange properties (Circle-K's service stations, convenience store properties and related assets, including fuel supply agreements) for the transfer to CAPL. During the exchange period, managers from both Circle K and CAPL exercised control over Plaintiffs' wages, hours of work, and working conditions and determined what DBM tasks these plaintiffs should focus in order to facilitate Defendants' exchange of assets. During the exchange period, the territories managed by Caldrone, Celusta, and Staats contained both Circle K sites and CAPL sites. Officers, directors and management of both companies determined

COMPLAINT

1  where Plaintiffs would work, and coordinated the work assigned to

2  Plaintiffs during the exchange period. As such, both Circle K and

3  CAPL are employers jointly and severally liable for the claims and

4  damages of plaintiffs Cladrone, Celusta ans Staats alleged in this

5  complaint.

6      20. It soon became clear that Defendants used their asset

7  exchanges and the sale of CAPL as cover to execute their long

8  simmering plan to force out, demote or fire their older DBMs and to

9  replace them with younger employees. Defendants began their plan to

10 force out older DBMs by ensuring that older DBMs were well aware

11 that they were no longer wanted by openly stating that older workers

12 were less desirable. For example, George Wilkins, then Vice

13 President of Operations of CAPL (and now Circle K's Director of

14 National Wholesale Fuels, California), would constantly complain to

15 Celusta, "You are old," "We [Circle K and CAPL] are out of date with

16 the business styles today." Then, when in November, 2019, it was

17 announced that 14 people would not be retained by Circle K or

18 transferred to CAPL as part of the asset exchanges, all of the 14

19 persons who were terminated as part of the asset exchanges were over

20 the age of 50. Each Plaintiff was subjected to discrimination in the

21 terms and conditions of their employment and discriminated against

22 in promotions or hiring with respect to positions that became

23 available at CAPL during the asset exchange periods.

24     21. **Discrimination Against Brian Caldrone** - Brian Caldrone,

25 was employed by Circle K as a DBM for both Circle K and CAPL from

26 2017 until January, 2020, when he was transferred to CAPL as part of

27 Defendants' asset exchange agreement. At the time he was hired,

28 Caldrone was 52 years of age and had 30 years of experience in the

10

1  service station and wholesale fuel industry. When Caldrone worked
2  for Circle K, he was paid a salary of approximately $77,402.00 with
3  a bonus potential was 20% of his base salary. Caldrone routinely
4  earned a bonus of approximately 17-18%. Caldrone's benefits included
5  a 401K match, a stock plan, 2 weeks of vacation each year, cell
6  phone reimbursement, a company car and gas card with Circle K
7  (replaced by CAPL with a $500 per month car allowance and a $0.21
8  per mile), and medical, vision, dental, life, and accidental
9  death/dismemberment insurance.

10          22.  In May, 2018, Caldrone was supervised by Regional
11 Director, Clay Gacke, Circle K's Regional Director of Operations of
12 its Wholesale Fuel Division and served as a DBM for both Circle K
13 and CAPL stations. On May 21, 2018 Caldrone received a review
14 stating that he was ready for the position of Director "immediately"
15 and he was in line for the next available position. Shortly
16 afterwards, a position as Director of Wholesale Fuels for CAPL came
17 available. However, the position was not posted or otherwise made
18 available for applications by all qualified persons who might be
19 interested. Instead of posting the position, George Wilkins, who was
20 then CAPL's Vice President of Operations and Gerardo Valencia,
21 CAPL's CEO, simply selected a younger (late 30s-early 40s), less
22 experienced, less qualified person, Miko Angeles, to fill the
23 position. Caldrone was qualified for and interested in the position,
24 but he was not permitted to apply for the position or offered the
25 opportunity to interview for the position. Caldrone complained to
26 Clay Gacke and Tom Maloney, Regional Director, about  the unfair
27 failure to permit him to apply for promotion, but got no response.
28 \\\

                                    11

23. After DMP purchased CAPL and Circle K and CAPL began to exchange assets, during the transfer period, Caldrone worked under the direction of managers from both Circle K and CAPL. Caldrone's DBM position was transferred to CAPL on or about January 1, 2020, for the asset exchange period. In or about February, 2020, during the transfer period, another Regional Director/Area Sales Manager position became available at CAPL. During the transition period, the hiring and promotions of employees was managed by both Circle K and CAPL. Again, instead of posting the position for Caldrone or any other employee to apply, Brent Boehm, a younger (late 30s-early 40s), less experienced, and unqualified person was selected for this position without an open application process. Boehm had joined CAPL in late 2018 and was younger, less experienced and less qualified than any of the DBMs who were all over 50 years of age and who were all interested in the position. Again, Caldrone was passed over, and not allowed to apply for, the promotion to a position that he was well qualified for.

24. Also, after the sale was announced and during the transition period, it was announced that, as part of the exchange, Valencia and Wilkins would transfer from CAPL to Circle K and that Wilkins was being transferred to California to be the West Coast Regional VP of Operations at Circle K's Corona office. In or about January, 2020, the position of Circle K's Director of West Coast Wholesale Fuels came available also at the Corona office. Consistent with Defendants' policy of excluding older employees from promotional opportunities, again, the position was not posted, advertised, or otherwise made available for applications by all qualified persons who might be interested. Again, instead of posting

12

the position, Miko Angeles, who was younger than Plaintiffs, less
experienced and less qualified was given the position without having
to compete with the older, more qualified employees. Caldrone was
qualified for and interested in the Director of West Coast Wholesale
Fuels position, but Defendants did not permit him to apply for the
position.

   25.   Caldrone complained to Angeles and Boehm about the
Defendants' discriminatory failure to permit him to apply for the
promotions, but his complaint was ignored and he was told that the
promotion decisions were made by Wilkins and Valencia. After
Caldrone complained, he was retaliated against. He was isolated and
had his authority undermined and taken away. His telephone calls and
emails were ignored and not responded to. He was cut out of the loop
and his work was sabotaged as the retaliatory isolation interfered
with his ability to respond to his customers' needs. At this time
Caldrone also observed irregularities in pricing of fuel and the
dealers were complaining. There were complaints from unbranded
stations that were supposed to receive unbranded product priced
based on the Marathon unbranded rack price+ $0.01. (A penny in the
fuel business is huge due to volume.) Instead, Defendants were
sending Exxon branded product and charging Dealers the Exxon price
which was $0.09 higher. It was the classic bait and switch. Dealers
were promised one product and, unbeknownst to them, a more expensive
product would be secretly switched in without their knowledge or
agreement. This was just one of many unlawful schemes which
Defendants operated to cheat their Dealers. Defendants also would
illegally hold Dealers' credit card proceeds for their convenience
store operations to offset charges for fuel; Defendants would hold

13

back and delay payment of Dealers' credit card receipts and
essentially use the Dealers own money to pay for the fuel so that
Dealers would essentially pre-pay for the fuel that was supposed to
be delivered with 4-day payment terms. Defendants' fraudulent
practice of holding Dealers' credit card receipts for the use of
Defendants was improper because dealers had contract-based payment
terms and security deposits which did not require pre-payment for
fuel. Each of Defendants' fraudulent practices were intended to
permit Defendants to maintain control over Dealers' business
operations by controlling the Dealers' access to their own earnings.
When Caldrone observed the repeated overcharging for unbranded fuel
he complained but got little or no response and no resolution as he
was being isolated and ignored. Finally, Caldreon complained to Glen
Foust, who was Boehm's supervisor, and he was told that the
"intention" was to correct the math. Meanwhile nothing was done to
correct the improper overcharging of the Dealers. Caldrone was
terminated 30 days later. He was told that there was no reason for
the termination.

26. **Discrimination Against Joseph Celusta** - Joseph Celusta
was employed by Circle K as a DBM for both Circle K and CAPL from
about September 2013 through February 14, 2020. At the time he was
hired, Celusta 28 years of experience in the service station and
wholesale fuel industry. Celusta's salary at Circle K was
approximately $75,186.90 per year, with a bonus potential of 20% of
his base salary. Celusta's benefits included, health, dental, vision
and life insurance benefits, 401k plan participation, and 2 weeks
paid vacation, among other things.

\\\

14

1        27. When Celusta was hired, he reported to the Regional
2    Director, Thomas C. Maloney. The goals were to increase volume
3    with-in and to seek new business opportunities. During his
4    employment, Celusta received positive evaluations across all
5    categories and was a top performer.
6        28. After Circle K and CAPL were merged in 2017, Wilkins,
7    who was then Vice President of Operations of CAPL, began to make
8    repeated derogatory comments about Celusta's age. Wilkins would
9    constantly tell Celusta, "You are old," and insinuate that that he
10   thought Celusta was out of date and behind the times.
11       29. In or about June 2018, the position of Regional
12   Director of Wholesale Fuels for CAPL came available became
13   available, this would have been considered a promotion for Celusta.
14   However, the position was not posted or otherwise made available for
15   applications by all qualified persons who might be interested.
16   Instead of posting the position, Wilkins, CAPL's Vice President of
17   Operations and Valencia, CAPL's CEO, simply selected the younger
18   (late 30s-early 40s), less experienced, less qualified person, Miko
19   Angeles, to fill the position. Celusta was more qualified for the
20   position, but, because of his age, he was not permitted to apply for
21   the position or offered the opportunity to interview for the
22   position.
23       30. The constant harassment increased significantly in
24   2019, at the time that Couche-Tard was contemplating splitting CAPL
25   off from Circle K. In the summer of 2019, Celusta was in Circle K's
26   Heartland office for a conference with the Director of the Heartland
27   office and Gerardo Valencia, President of CAPL. After the meeting,
28   as Celusta and Valencia left, Valencia asked Celusta, "Now that you

15

are getting older, do you plan on retiring soon?" Celusta said that he did not plan on social security until he turned 70 years old. Shortly after, when Celusta commented to Maloney that he noticed that Valenica and Wilkins had started to micro-manage him, Maloney responded, "Joe, you just really need to quit." Later in the summer of 2019, George Wilkins told Celusta, "You're getting too old for this business," "the business is changing, you guys (Celusta and Tom Maloney, Eastern Regional Director of Circle K's National Wholesale Fuels, who was over 50 years of age). Wilkins then asked directly, "Joe, how old are you?" to which Celusta responded, "56." Wilkins then stated, "Joe, you should really start thinking about retiring. You're out of touch. We no longer take care of business the old way." Celusta was offended and distressed by the constant derogatory comments about his age and the blatant efforts to push him into premature retirement. However, he did not retire and continued to do his job despite the insults and the stress of the harassment he was forced to endure.

31. Later, in November, 2019, it was announced that 14 people would not be retained by Circle K or transferred to CAPL as part of the asset exchanges. Celusta was told by Tom Maloney that he would not be one of the 14 people terminated, because of his strong performance, however, shortly after, Wilkins called and told Celusta that he was one of the 14 people who would not be retained by either of the companies once the transition was completed. All of the 14 persons who were terminated were over the age of 50.

32. After DMP purchased CAPL and Circle K and CAPL began to exchange assets, during the transfer period, Celusta worked under the direction of managers from both Circle K and CAPL. In or about

16

1 February, 2020, during the transfer period, and at the time Celusta
2 was slated for termination, another Regional Director/Area Sales
3 Manager position became available at CAPL. During the transition
4 period, the hiring and promotions of employees was managed by both
5 Circle K and CAPL. Despite the fact that Celusta was a top performer
6 and eminently qualified for promotion to Regional Director, again,
7 instead of posting the position for Celusta to apply, Brent Boehm,
8 a younger (late 30s-early 40s), less experienced, and unqualified
9 person was selected for this position without an open application
10 process. Celusta was passed over because Defendants thought him too
11 old and Defendants wanted him to retire.

12        33.  Also,  during  the  transition  period,  in  or  about
13 January, 2020, the position of Circle K's Director of West Coast
14 Wholesale Fuels came available. This was another position for which
15 Celusta was well qualified. However, Celusta was prevented from
16 applying for the position because the position was not posted,
17 advertised, or otherwise made available for applications by all
18 qualified persons who might be interested. Instead of posting the
19 position, Miko Angeles, who was younger than Celusta, less
20 experienced and less qualified was given the position. Celusta who
21 was slated for termination was interested in a position, such as
22 Director of West Coast Wholesale Fuels, but Defendants did not
23 permit him to apply for the position.

24        34.  In  addition  to  refusing  to  bend  to  Defendants'
25 unlawful efforts to force him out, Celusta continued to report and
26 complain to Defendants about misconduct, illegal and unsafe
27 activities and to demand that Defendants' take corrective action.
28 For example, August, 2019, Celusta learned that Circle K had spilled

17

COMPLAINT

1  approximately 3,000 gallons of diesel in Gilman, Illinois. Records
2  from the tank monitoring system and a private contractor checking
3  the monitoring wells verified the diesel spill had occurred. Circle
4  K owned the tanks and systems that spilled the diesel. Celusta
5  complained that the company needed to start cleaning immediately,
6  but Circle K waited a month, which allowed the contaminants to
7  travel out into the ground water and contaminate Gilman's main well
8  water source. Despite Celusta's complaints and efforts to get Circle
9  K to clean up the spill, Circle K did not report the incident to the
10 EPA as required (40 C.F.R. 112.4, 40 C.F.R. 280, 41 IAC Section
11 176.340) and did nothing to clean up the contamination. Instead,
12 Circle K informed Celusta that their plan was to cover-up the spill
13 until after July, 2021, when their ownership of the tanks and
14 equipment would expire. Celusta also informed CAPL of the Gilman
15 spill because the location was to be transferred to CAPL as part of
16 an asset exchange. Celusta also complained about a Circle K location
17 in Deefrield, Illinois where Circle K has a station with a broken
18 lift station which causes contaminated water and would cost only
19 $30,000 to repair. Circle K ignored Celusta's complaints and,
20 instead of repairing the broken lifts, Circle K pumps the
21 contaminated water into the Deerfield sewer system on nights and
22 weekends. Again, despite Celusta's repeated complaints, Circle K
23 refused to repair the broken lifts. This was just a continuation f
24 Defendants' pattern and practice of simply ignoring the laws that
25 did not suit them. Celusta was terminated in retaliation because he
26 refused to retire early and after he complained about Circle K's
27 illegal activities.
28 \\\

COMPLAINT

35. Celusta's last day of work was February 14, 2020. At the time that Celusta's job was terminated he had just returned from an award trip to Costa Rica for top sales "Circle of Winners." When he returned from his award trip, he was told that he was being replaced by Yaro Fedotov, an unqualified 25 year old with far less experience in the business.

36. **Discrimination against Kathleen Staats** - Staats began her employment with Circle K on or about April 8, 2010, and served as a  DBM for both Circle K and CAPL. Staats has over 30 years of experience in the petroleum industry and has had several managerial roles, including Sales Manager with supervision of 5 direct reports. Staats' DBM position was transferred to CAPL on or about January 1, 2020, during the asset exchange period.

37. With Circle K, Staats was paid a salary of approximately $80,101.29 per year with a bonus potential that was 20% of her base salary. Staats routinely earned a bonus of approximately 12-18%. With Circle K, Staats' had benefits including, health, dental, and vision, and life insurance, 401k plan participation, and 2 weeks paid vacation, cell phone reimbursement, a company car and gas card with Circle K (replaced by CAPL with a $500 per month car allowance and a $0.21 per mile).

38. During her employment with Circle K, Staats received positive evaluations across all categories and was recommended for a promotion and was interested in any promotions that might come available. In or about June 2018, a position as Regional Director of Wholesale Fuels for CAPL came available became available, this would have been considered a promotion for Staats. However, the position was not posted or otherwise made available for applications by all

1  qualified persons who might be interested. Instead of posting the
2  position, CAPL simply selected a younger (late 30s-early 40s), less
3  experienced, less qualified person, Miko Angeles, to fill the
4  position. Staats was more qualified for the position, but she was
5  not permitted to apply for the position or offered the opportunity
6  to interview for the position. Staats complained about Defendants
7  failure to permit her to apply for the promotion, but was told that
8  Wilkins had directed that the position be given to Angeles. Though
9  Staats complained, nothing was done to investigate or correct the
10  situation.

11       39. After DMP purchased CAPL and during the transition
12  period, in or about January, 2020, the position of Circle K's
13  Director of West Coast Wholesale Fuels came available. However,
14  older employees, such as Staats, were excluded from applying for
15  this promotional opportunity because the position was not posted,
16  advertised, or otherwise made available for applications by all
17  qualified persons who might be interested. As discussed above,
18  instead of posting the position, Miko Angeles, who was younger than
19  Staats, far less experienced and less qualified was given the
20  position without having to compete with other older, more qualified
21  employees such as Staats. Staats was well qualified for and
22  interested in the Director of West Coast Wholesale Fuels position,
23  but Defendants did not permit her to apply for the position.

24       40. After the sale was announced, during the transfer
25  period, Staats worked under the direction of managers from both
26  Circle K and CAPL. In or about February, 2020, during the transfer
27  period, another Regional Director/Area Sales Manager position became
28  available at CAPL. During the transition period, the hiring and

COMPLAINT

promotions of employees was managed by both Circle K and CAPL.
Again, instead of posting the position for Staats or any other
employee to apply, Brent Boehm, a younger (late 30s-early 40s), less
experienced, and unqualified person was placed in this position
without an open application process. Boehm had joined CAPL in late
2018 and was younger, less experienced and less qualified than
Staats who was interested in a promotion and would have applied for
the position if it had been posted and she had been given an
opportunity to submit an application. Staats was passed over and not
allowed to apply for promotion to a position that she was well
qualified for. As a result, Staats now reports to the far less
qualified Boehm. Again, Staats complained about Defendants failure
to post the position and the refusal to permit her to apply for a
promotion, but was told that Valencia and Wilkins had directed that
the position be given to Boehm. Nothing was done to investigate or
correct the situation.

        41.  During the transition period, Staats noticed the
improper handling of charitable donations which Circle K collected
from Dealers for based on representations that the donations would
be given to the Big Brothers and Big Sisters of America ("BBBS")
charitable organization. In or about March, 2019, Wilkins and
Angeles assigned Staats as Chairperson to prepare a program to
solicit donations from Defendants' Dealers to the BBBS organization.
Staats successfully raised $94,636.04 in donations which was all
collected from the dealers by November, 2019. However, though the
donations were collected from the Dealers they were not given to the
BBBS organization for which they were collected. From December
through August, 2020, Staats complained about the failure to donate

COMPLAINT

1  to BBBS the money Defendants had collected from their Dealers. When
2  Staats inquired as to why the funds collected had not been donated
3  to the BBBS, she was informed that they had been transferred to
4  CAPL. Staats then complained to Joe Topper, the new owner of CAPL,
5  about the failure to provide the Dealers's donations to the BBBS as
6  had been promised. Staats complained about the improper withholding
7  of the charitable donations and requested that the situation be
8  rectified. As a result, in June, 2020, Staats was contacted by
9  Topper who said the BBBS funds were safe and that he was holding
10 them in an account with his other money for charities. He did not
11 state why he was holding the Dealers' charitable donations. Instead
12 of discussing the reasons why he was withholding the donations from
13 BBBS, Topper began to question Staats about her age. At first,
14 Topper thought Staats worked for BBBS and did not realize that
15 Staats worked for CAPL. After Staats informed Topper, "no, I work
16 for you," and they discussed Staats' career briefly, Topper stated,
17 "well, I assume you're not 21 since you worked for SHELL many years
18 but you don't sound 60 either. How old are you?" Shocked, Staats
19 stated, that she was "in the middle" and left it there. After the
20 conversation with Topper, Staats received a 2.25 rating on her
21 performance evaluation, the lowest rating of her 30-year career
22 (from a less qualified boss who had worked with her for less than 6
23 months). CAPL's Human Resources ("HR") department also began to
24 harass Staats by complaining that she "was always in the doctor's
25 office," "asking if there was something wrong with her," and snidely
26 inquiring whether the HR Department needed to schedule Staats' job
27 responsibilities since she was "at the doctors' office all the
28 time." The harassment over Staats' medical visits was intended to

22

COMPLAINT

1  provide a phoney basis to write Staats up for baseless claims that
2  she was not performing her job because of medical appointments.
3  Thus, Boehm reported Staats to HR in anticipation that she would not
4  be able to attend a ride-along he had unilaterally scheduled, even
5  though, in fact Staats was able to re-schedule her doctors
6  appointment and was able to attend the Boehm's last minute ride-
7  along. Additionally, after Staats' conversation with Topper, further
8  retaliated against when she was stripped of one of her high-
9  performing stations while being left with a concentration of poor-
10 performing stations. The practice of stripping high-performing
11 stations that a DBM has nurtured and developed is intended to
12 artificially lower a DBM's performance rating by giving the positive
13 benefits of the affected DBM's best work to others, while
14 immediately lowering the affected DBMs ratings by saddling them with
15 lower performing sites. The stripping of a DBM's high-performing
16 stations is a demoralizing demotion that is intended to lower the
17 DBM's raises (thereby lowing career earnings), remove a DBM from
18 consideration for promotions, stifle the DBM's ability to compete
19 for awards, and signal to the DBM's colleagues that the DBM is on
20 the way out.

21        42. Staats also observed irregularities in pricing of fuel
22 for the dealers with whom she worked. As discussed above, though
23 unbranded stations were supposed to receive an unbranded product
24 priced based on the Marathon unbranded rack price+ $0.01, instead,
25 Defendants sent Marathob branded product to unbranded stations and
26 charged the unbranded Dealers the Marathon branded price which was
27 higher, in a bait and switch. Dealers were promised one product and,
28 unbeknownst to them, a more expensive product would be secretly

23

switched in without their knowledge or agreement and Defendants would automatically deduct the higher price from the unbranded Dealers' credit card receipts. Staats also complained about Defendants' practice of unlawfully hold Dealers' credit card proceeds for their convenience store operations to offset charges for fuel.

43. The result of Staats' complaints was an unfair, negative performance evaluation from her unqualified supervisor, Boehm. Boehm officially became Staats' supervisor in April 2020, but he met with her on August 12, 2020, to review her work for the past year. When Boehm met with Staats he knew the 2.25 rating he was about to give her was not a good faith evaluation of her job performance. He began the meeting by stating: "Before you get upset, I gave you almost all 4s in every area, but Senior Management made me change it." The 2.25 rating that Senior Management decreed would be given to Staats is below "needs improvement" and is considered "failing" in the assigned position. The bad faith tactics of CAPL's Senior Management is clearly seen in the performance evaluation where excellent written comments such as "Kathy has a wealth of knowledge and industry experience," "Kathy is already stepping up and taking charge of the situation," "Kathy's able to handle her clients well and has received much praise from them," and "Kathy truly is a team player," are clearly at odds with the 2.25 rating of a person who is failing in the position. In 2019, before Topper became interested in knowing Staats' age, she was rate a 4, received a top bonus and won her area's trip to Costa Rica which was awarded to the top rated DBM's in each area.

\\\

24

44. **Discrimination against Gaila Williams** - Williams began her employment with Circle K on or about September 2, 2014, and served as a DBM for both Circle K and CAPL. Williams has over 18 years of experience in the petroleum industry.

45. With Circle K, Williams was paid a salary of approximately $92,604 per year with a bonus potential that was 20% of her base salary. Williams routinely earned a bonus of approximately 15-20%. With Circle K, Williams' had benefits including, health, dental, and vision, and life insurance, 401k plan participation, and 2 weeks paid vacation, cell phone reimbursement, a company car and gas card with Circle K.

46. At all times during her employment Williams has been an exemplary DBM as represented by excellent performance evaluations, oral commendations, and repeated awards including, Circle K's Top Performer award winning back-to-back incentive trips. Williams was ranked at #1-#3 of DBMs in the United States in 3 of the past 4 years. On multiple occasions Williams managed the stations ranked #1-#4 in the country. Two of William's prior Directors had expressed their confidence in Williams and stated that, based on her performance, she was well suited for a Director's position should one arise. After DMP purchased CAPL during the period from November, 2019, through January, 2020, Williams' Regional Director, Mike Bonnert inquired about Williams' interest in promotion and encouraged her to apply for promotion; however, Bonnert acknowledged that despite Williams' strong performance the current management would likely deny her the opportunity to advance in the company because of her age. Bonnert said the company was clearly "seeking younger people" and that the company "was not

COMPLAINT

embracing older employees over 50 for these types of positions (regardless of experience or performance)." Bonnert stated that he was under pressure from his superiors to fire older DBMs without sufficient cause. Bonnert encouraged Williams to consider looking outside the company for advancement opportunities if the company were not fair with me. At this time, Valencia and Wilkins who served as Bonnert's superiors, had worked with Williams, and were clearly pressuring her superiors to block her promotion.

47. In or about June 2018, a position as Regional Director of Wholesale Fuels for CAPL came available became available, this would have been a promotion for Williams. However, the position was not posted or otherwise made available for applications by all qualified persons who might be interested. Instead of posting the position, CAPL simply selected a younger (late 30s-early 40s), less experienced, less qualified person, Miko Angeles, to fill the position. Williams was more qualified for the position, the position was not posted, therefore, she was not permitted to apply for the position or offered the opportunity to interview for the position.

48. After DMP purchased CAPL and during the transition period, in or about January, 2020, the position of Circle K's Director of West Coast Wholesale Fuels came available. With her lifetime of work in the California market, Williams should have been a prime candidate for promotion to Director of West Coast Wholesale Fuels. However, older employees, such as Williams, were excluded from applying for this promotional opportunity because the position was not posted, advertised, or otherwise made available for applications by all qualified persons who might be interested. As discussed above, instead of posting the position, Miko Angeles, who

1  was younger than Williams, far less experienced and less qualified

2  than Williams, and who was lacking any knowledge or experience in

3  the West Coast petroleum industry, was given the position without

4  having to compete with other older, more qualified employees such as

5  Williams. Williams was well qualified for and interested in the

6  Director of West Coast Wholesale Fuels position. This was the

7  promotion she had been awaiting and for which her two prior

8  Directors, had found her well prepared, but Defendants did not

9  permit her to apply for the position.

10        49.  As soon as Wilkins, Ciminelli, and Angeles took over

11  Circle K's West Coast office they targeted Williams for demotion in

12  an obvious effort to force her to quit. Angeles was spoke openly of

13  being tasked with terminating certain employees. He said, "They are

14  sending me to California to clean house!" When Williams complained

15  and asked him why he was telling everyone that he was cleaning

16  house, Angeles did not have an answer. However, in April, 2020,

17  shortly after Williams confronted Angeles, she, too, retaliated

18  against when she was demoted when she was stripped of her high-

19  performing stations (destroying over 150 established work

20  relationships) while being left with a concentration of poor-

21  performing stations. The high-performing, award-winning, stations

22  that Williams had developed were replaced with stations with lower

23  scores, in violent neighborhoods, with historical poor performance

24  and business challenges–in the middle of the pandemic. Consequently,

25  Williams was left with a concentration of poor-performing stations

26  with low mystery shopper scores, all designed to instantly lower her

27  performance rating, cause her to lose sales and diminish her ability

28  to obtain bonuses, awards, and promotions.

50. In addition to demoting Williams by stripping her of her stations and reassigning her to historically poor performing sites, Angeles, Ciminelli, Director of Wholesale Fuels, and HR Manager Cynthia Enriquez-Herrera conspired to fabricate a complaint against Williams in order to justify a phony personnel action. When it became apparent to Williams that Angeles, Ciminelli and Herrera had fabricated the complaint, Angeles, Ciminelli and Herrera compounded their lies by threatening to fire Williams, viciously verbally attacking Williams and writing her up again, falsely claiming that she had been "upset" and "aggressive" when she found out that they had lied about a complaint as they tried to "paper" her personnel file in their effort to force her out of the company.

51. Williams also complained about Defendants' practice of illegally holding Dealers' credit card proceeds for their convenience store operations to offset charges for fuel. Williams further complained about Angeles and his boss, Marcello Ciminelli, attempting to circumvent antitrust laws and the Petroleum Marketing Practices Act ("PMPA") by trying to fix the resale price at which Dealers could sell fuel to control Dealers' street prices and decide the profit margins Dealers would be allowed to make on their fuel sales. In fact, Angeles threatened not to help specific Dealers with needed Covid19 relief if the Dealers chose not to price their fuel as Angeles directed. Defendants' fraudulent practices of coercing Dealers in order for Defendants to control the setting of fuel prices and holding Dealers' credit card receipts for the use of Defendants were improper because the violated California and federal antitrust laws and the PMPA.

\\\

COMPLAINT

52. On or about June 2, 2020, as a result of Circle K's blatant discriminatory actions, Williams filed her complaint of discrimination with the DFEH. After Williams filed her DFEH complaint, on or about June 23, 2020, the response to Williams' complaints was retaliation with an unfair, negative performance evaluation from Angeles. Suddenly, after Wilkins, Ciminelli and Angeles took over Circle K's California office, Williams rating on her performance review dropped from a 100% rating in 2019 to a 65% rating by a younger, less experience, Angeles, who had barely known Williams for 3 months. Although Angeles had almost no knowledge of the West Coast petroleum market and was only managing Williams for the final 45 days of the fiscal year, he disregarded her major accomplishments and downgraded her performance rating for the entire year.   Angeles accomplished this sudden trashing of Williams' performance by inventing goals and plans for Williams after the year-end when there was no opportunity to work on  or accomplish the past-dated goals and then giving Williams negative ratings because of her purported failure to have achieved after-invented goals.

53. As can be seen from the facts above, Defendants' demotions, failures to promote, and terminations of Plaintiffs  was part of a pattern and practice of age discrimination including:

a.    Discrimination in Promotions.  Defendant's policies were and are not applied uniformly or fairly.  Defendants' written and unwritten policies and practices regarding promotions did not require advertising or posting of all positions and which amounted to word of mouth recommendations and other closed procedures.  Not posting jobs also permits Defendants to create positions for younger individuals who they would like to advance

1  within the corporate structure at the expense of their older

2  workers.  As a result of this kind of discrimination, workers over

3  the age of 50 are denied the opportunity to advance to the same

4  level and at the same rate as equally or less qualified workers who

5  are substantially younger or under the age of 40.

6         b.    Discrimination in Evaluations: The performance

7  evaluation system employed by Defendants is implemented by managers

8  exercising undue authority to make biased and inconsistent

9  determinations with little or no objectivity required.  For example,

10 performance reviews are concentrated in the hands of Defendants'

11 Senior Management, who have an undue influence on the review process

12 because they review all performance evaluations before they are made

13 final and determine the ratings to give each employee based on the

14 employee's age and whether Defendants want to push the employee into

15 retirement.  This system permits discrimination on the basis of age

16 in evaluations, where raises, bonuses and stock options, as well as

17 further advancement within the companies, are based on evaluation

18 scores, pursuant to Defendants' written policies on compensation.

19 Because of the undue discretion of managers, workers who are over

20 the age of 50 receive more low evaluation scores than workers who

21 are substantially younger or who are under the age of 40, and fewer

22 high scores.

23         c.    Discriminatory Demotions. Defendant's policies

24 were and are not applied uniformly or fairly. Defendants practice of

25 arbitrarily stripping older workers of the high performing sites

26 that they have developed over years and leaving them with a

27 concentration of poor-performing stations is intended to

28 artificially and subjectively lower a particular DBM's performance

30

rating. This practice also lowers a DBM's competitive ranking as against peers. The stripping of a DBM's high-performing stations is a emotion that lowers the DBM's raises (thereby lowing career earnings), removes the DBM from consideration for promotions, and stifles the DBM's ability to compete for awards.

54. This discrimination represents company-wide patterns and practices, rather than a series of isolated incidents. Defendants' written and unwritten policies and practices regarding evaluations, compensation, promotions and demotions subject Plaintiffs to ongoing disparate treatment. Defendants' actions constitute a continuing violation of the rights of Plaintiffs.

55. As discussed above, Defendants' managers and executives with control over and responsibility for promotions, demotions, hiring and termination policies, practices and decisions (including those for each Plaintiff) have made negative and discriminatory statements about older workers aged 50 and older.

56. At all times during their employment, each Plaintiff was an exemplary employee who had many positive and complimentary communications from their customers and who were recommended for promotion by their Directors.

57. Despite each Plaintiffs' excellent work, Defendants continuously subjected each of them to ongoing and continual harassment and offensive comments at work because of their age with the intention to cause Plaintiffs to experience such humiliation, pain and suffering that it would force each Plaintiff to quit all in violation of the California FEHA and the Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621-634. Plaintiffs have filed complaints with the EEOC and with the

COMPLAINT

California DFEH. Plaintiffs have received Right-to-sue letters from the DFEH. Plaintiffs have either received Right-to-Sue letters or 60 days have elapsed since plaintiffs filed their complaints with the EEOC.

58. Plaintiffs complained of the offensive, harassing, and discriminatory conduct to which they were subjected by Defendants, as well as the unlawful actions in which Defendants were engaging. Each Plaintiff complained to each defendant's management and to its HR Department about the age discrimination and the oppressive and offensive work environments to which they were subjected. Despite each Plaintiff's complaints about the discriminatory treatment to which they were subjected, nothing was done by Defendants to stop the unlawful and hostile conduct. Defendants failed and refused to take immediate and appropriate corrective action to remedy the hostile environment and unlawful activity to which each Plaintiff was subjected. Moreover, after Plaintiffs reported their complaints they were subjected to retaliation.

59. This discriminatory, hostile and offensive, age motivated conduct had an severely distressing emotional impact on each Plaintiff and on each Plaintiff's daily work and caused Plaintiffs to become physically sickened as a consequence of having to deal with daily stress, harassment and offensive conduct.

60. Caldrone was subjected to such discrimination and hostile conduct that he suffered severe emotional distress, his sleep became disrupted, and became depressed and suffered anxiety as a result.

\\\

\\\

61.   Celusta suffered severe emotional distress, and anxiety, sleep disruption, hair loss, and became depressed and suffered anxiety as a result.

62.   Staats suffered severe distress as a result of the hostile and discriminatory actions. Staats became anxious and severely distressed and physically sick with stomach pains, shortness of breath, and sleeplessness, among other things.

63.   Williams suffered severe emotional distress as a result of the hostile and discriminatory actions described herein. Williams became anxious and severely distressed and physically sick with stomach pains, shortness of breath, and sleeplessness, loss of ability to concentrate due to stress, among other things.

64.   Rather than take immediate action to address the hostile and discriminatory conduct and unlawful activities that Plaintiffs' complaint of, Defendants' management refused to investigate and ratified the unlawful conduct and retaliated against Plaintiffs, the victims of this outrageous discriminatory and offensive conduct. Defendants responded to Plaintiffs' complaints of discrimination by passing them over for promotions, giving unwarranted negative performance appraisals, manufacturing phoney complaints about plaintiffs' work, and by terminating the employment of certain plaintiffs.

65.   The offensive and discriminatory treatment to which Plaintiffs were subjected, as alleged herein, was routine and premeditated in the workplace, and resulted in a work environment that was hostile to Plaintiffs as employees over the age of 50. This hostile environment was so pervasive and so permeated Plaintiffs' work place as to alter the conditions of Plaintiff's employment.

33

1  Defendants' actions, as alleged above, were based on Plaintiffs'

2  age, were unwelcome to Plaintiffs and were so severe and pervasive

3  that they negatively altered Plaintiffs' work place by creating an

4  environment hostile to Plaintiffs.

5      66. Plaintiffs were discriminated against with respect to

6  the terms and conditions of their employment. There was a disparity

7  between the positions, treatment, terms and conditions of employment

8  of Plaintiffs, who are members of the protected class of employees

9  over the age of 50, and the positions, treatment, terms and

10 conditions of employment of comparably qualified employees who were

11 not over the age of 50 as well those who were under the age of 40.

12     67. After making their complaints, Plaintiffs were

13 subjected to retaliation as discussed above. Plaintiffs were

14 excellent employees whose only fault was having complained to

15 Defendants' about discrimination to which they were subjected and

16 unlawful activity that they witnessed occurring in the workplace.

17     68. As a proximate result of Defendants' unlawful,

18 discriminatory and retaliatory actions against Plaintiffs, as

19 alleged above, Plaintiffs have been harmed in that Plaintiffs have

20 suffered the loss of the wages, salary, benefits, and additional

21 amounts of money Plaintiffs would have received if Plaintiffs had

22 not been wrongfully discriminated against and retaliated against by

23 Defendants. As a further proximate result of Defendants' unlawful

24 actions against Plaintiffs, as alleged above, Plaintiffs have been

25 harmed in that Plaintiffs have suffered the intangible loss of

26 employment-related opportunities. Also, as a further proximate

27 result of Defendants' unlawful, discriminatory and retaliatory

28 actions against Plaintiffs, as alleged above, each Plaintiff has

COMPLAINT

1  been harmed in that each Plaintiff has suffered physical injury and

2  sickness, humiliation, mental anguish, and emotional and physical

3  distress, and has been injured in mind and body.

4          69.   The   wrongful   conduct   of   Defendants   set   forth

5  hereinabove was perpetrated upon each Plaintiff intentionally,

6  willfully, fraudulently, in conscious disregard of Plaintiff's

7  rights and safety and with a callous indifference to the injurious

8  consequences which were substantially certain to occur and was

9  shameful, despicable and deplorable.  The wrongful conduct of

10 Defendants set forth hereinabove was perpetrated upon Plaintiffs

11 maliciously, with the intention by Defendants to cause injury to

12 Plaintiffs and was despicable conduct carried on by Defendants with

13 a  willful  and  conscious  disregard  of  the  rights  or  safety  of

14 Plaintiffs. The wrongful conduct of Defendants set forth hereinabove

15 was also oppressive in that it was despicable conduct that subjected

16 Plaintiffs to cruel and unjust hardship in conscious disregard to

17 each Plaintiffs' rights.  Such despicable conduct was base, vile and

18 contemptible.  Plaintiffs are further informed and believe that each

19 business or corporate employer, through its officers, directors and

20 managing  agents,  and  each  individual  defendant,  had  advance

21 knowledge of the wrongful conduct, with a conscious disregard of the

22 rights and safety of each Plaintiff, and after becoming aware of

23 their wrongful conduct, each corporate defendant by and through its

24 officers,  directors  and  managing  agents,  and  each  individual

25 defendant  authorized  and  ratified  the  wrongful  conduct  herein

26 alleged.  Therefore, Plaintiffs seek exemplary and punitive damages

27 against Defendants in an amount according to proof.

28 \\\

## FIRST CAUSE OF ACTION

### (Age Discrimination in Violation of Govt. Code §12900
### Against All Defendants)

70. Plaintiffs restate and incorporate by reference each and every allegation contained in paragraphs 1 through 69, inclusive, as though fully set forth herein.

71.  Plaintiffs are individuals over the age of 40 and are therefore members of a protected class. As discussed above, Defendants used policies and practices related to hiring, promotions and employment described herein that have had a disparate impact on the basis of age (discriminating against workers who are age 50 and older) that are not job-related for the positions at issue, not consistent with business necessity and are not necessitated by any reasonable factor other than age.

72. As discussed above, Defendants engaged in a pattern and practice of discrimination against individuals who are age 50 and older by (i) knowingly and intentionally, in Defendants' promotion and employment practices, treating adversely individuals who are 50 years old and older, and treating preferentially individuals who are substantially younger and individuals who are under 40 years old, (ii) promoting disproportionally and preferentially individuals who are under 40 years old, even when individuals age 50 and older are available and equally or more qualified for the available positions, and (iii) using sudden, uncharacteristically negative performance evaluations to manufacture negative items in the personnel files of older workers over the age of 50 to artificially remove older workers from consideration for promotions and to reduce their raises and wages

1  relative to younger workers so as to cause the older workers to

2  retire or quit.

3        73.  Plaintiffs were discriminated against with respect

4  to the terms and conditions of their employment including the

5  failure to promote, wrongful demotion, sudden uncharacteristic

6  negative job evaluations, hostile work environment, retaliation

7  and, in the cases of Caldrone and Celusta, the termination of

8  their employment. As such, Plaintiffs were denied fair

9  opportunities with regard to positions, compensation and

10 employment with Defendants.

11       74. Defendants' discriminatory acts, as detailed above,

12 toward Plaintiff in the treatment, terms and conditions of their

13 employment violated the FEHA.

14       75. As a proximate result of Defendants' discriminatory

15 and retaliatory actions against Plaintiffs, as alleged above,

16 Plaintiffs have been harmed in that Plaintiffs have suffered the

17 loss of the wages, salary, benefits, and additional amounts of

18 money Plaintiffs would have received if Plaintiffs had not been

19 wrongfully discriminated against and retaliated against by

20 Defendants.  As a further proximate result of Defendants'

21 discriminatory actions against Plaintiffs, as alleged above,

22 Plaintiffs have been harmed in that Plaintiffs have suffered the

23 intangible loss of employment-related opportunities.  Also, as a

24 further proximate result of Defendants' discriminatory and

25 retaliatory actions against Plaintiffs, as alleged above,

26 Plaintiffs have been harmed in that Plaintiffs have suffered

27 humiliation, mental anguish, and emotional distress, physical

28 injury and sickness and have been injured in mind and body.

76. The wrongful conduct of Defendants set forth hereinabove was perpetrated upon Plaintiffs intentionally, willfully, fraudulently, in conscious disregard of Plaintiffs' rights and safety and with a callous indifference to the injurious consequences which were substantially certain to occur and was shameful, despicable and deplorable.   The wrongful conduct of Defendants set forth hereinabove was perpetrated upon Plaintiffs maliciously, with the intention by Defendants to cause injury to Plaintiffs and was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights or safety of Plaintiffs.   The wrongful conduct of Defendants set forth hereinabove was also oppressive in that it was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights.   Such despicable conduct was base, vile and contemptible.   Plaintiffs are further informed and believe that each business or corporate employer, through its officers, directors and managing agents, and each individual defendant, had advance knowledge of the wrongful conduct, with a conscious disregard of the rights and safety of Plaintiffs, and after becoming aware of their wrongful conduct, each corporate defendant by and through its officers, directors and managing agents, and each individual defendant authorized and ratified the wrongful conduct herein alleged.   Therefore, Plaintiffs seek exemplary and punitive damages against Defendants in an amount according to proof.

\\\

\\\

\\\

COMPLAINT

## SECOND CAUSE OF ACTION

**(Age Discrimination in Violation of the ADEA,
29 U.S.C. § 621, et seq.
Against All Defendants**

77. Plaintiffs restate and incorporate by reference each and every allegation contained in paragraphs 1 through 69, inclusive, as though fully set forth herein.

78. Plaintiffs are individuals over the age of 40 and are therefore members of a protected class. As discussed above, Defendants used policies and practices related to hiring, promotions and employment described herein that have had a disparate impact on the basis of age (discriminating against workers who are age 50 and older) that are not job-related for the positions at issue, not consistent with business necessity and are not necessitated by any reasonable factor other than age.

79. As discussed above, Defendants engaged in a pattern and practice of discrimination against individuals who are age 50 and older by (i) knowingly and intentionally, in Defendants' promotion and employment practices, treating adversely individuals who are 50 years old and older, and treating preferentially individuals who are substantially younger and individuals who are under 40 years old, (ii) promoting disproportionally and preferentially individuals who are under 40 years old, even when individuals age 50 and older are available and equally or more qualified for the available positions, and (iii) using sudden, uncharacteristically negative performance evaluations to manufacture negative items in the personnel files of older workers over the age of 50 to artificially remove older workers from consideration for promotions and to reduce their raises and wages

1  relative to younger workers so as to cause the older workers to
2  retire or quit.

3       80.  Plaintiffs were discriminated against with respect
4  to the terms and conditions of their employment including the
5  failure to promote, wrongful demotion, sudden uncharacteristic
6  negative job evaluations, hostile work environment, retaliation
7  and, in the cases of Caldrone and Celusta, the termination of
8  their employment. As such, Plaintiffs were denied fair
9  opportunities with regard to positions, compensation and
10 employment with Defendants.

11      81. Defendants' discriminatory acts, as detailed above,
12 toward Plaintiff in the treatment, terms and conditions of their
13 employment violated the ADEA, 29 U.S.C. § 621, et seq.

14      82. As a proximate result of Defendants' discriminatory
15 and retaliatory actions against Plaintiffs, as alleged above,
16 Plaintiffs have been harmed in that Plaintiffs have suffered the
17 loss of the wages, salary, benefits, and additional amounts of
18 money Plaintiffs would have received if Plaintiffs had not been
19 wrongfully discriminated against and retaliated against by
20 Defendants.  As a further proximate result of Defendants'
21 discriminatory actions against Plaintiffs, as alleged above,
22 Plaintiffs have been harmed in that Plaintiffs have suffered the
23 intangible loss of employment-related opportunities.  Also, as a
24 further proximate result of Defendants' discriminatory and
25 retaliatory actions against Plaintiffs, as alleged above,
26 Plaintiffs have been harmed in that Plaintiffs have suffered
27 humiliation, mental anguish, and emotional distress, physical
28 injury and sickness and have been injured in mind and body.

83. The wrongful conduct of Defendants set forth hereinabove was perpetrated upon Plaintiffs intentionally, willfully, fraudulently, in conscious disregard of Plaintiffs' rights and safety and with a callous indifference to the injurious consequences which were substantially certain to occur and was shameful, despicable and deplorable. The wrongful conduct of Defendants set forth hereinabove was perpetrated upon Plaintiffs maliciously, with the intention by Defendants to cause injury to Plaintiffs and was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights or safety of Plaintiffs. The wrongful conduct of Defendants set forth hereinabove was also oppressive in that it was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights. Such despicable conduct was base, vile and contemptible. Plaintiffs are further informed and believe that each business or corporate employer, through its officers, directors and managing agents, and each individual defendant, had advance knowledge of the wrongful conduct, with a conscious disregard of the rights and safety of Plaintiffs, and after becoming aware of their wrongful conduct, each corporate defendant by and through its officers, directors and managing agents, and each individual defendant authorized and ratified the wrongful conduct herein alleged. Therefore, Plaintiffs seek exemplary and punitive damages against Defendants in an amount according to proof.

\\\

\\\

\\\

41

### THIRD CAUSE OF ACTION

### (Hostile Work Environment in Violation of the FEHA, Against All Defendants

84. Plaintiffs restate and incorporate by reference each and every allegation contained in paragraphs 1 through 69, inclusive, as though fully set forth herein.

85. Plaintiffs were repeatedly subjected to harassing conduct from the Defendants' managers and officers, including repeated offensive, age-related negative comments from Valencia and Wilkins who were the driving force behind the age discrimination described above.  This discriminatory conduct was pervasive, permeated the workplace, known to each plaintiff, and included, but was not limited to, the following incidents:

(a) Defendants openly stated that older DBMs were less desirable. This was told to Regional Directors who ensured that each Plaintiff was made aware of Defendants' position.

(b) George Wilkins, then Vice President of Operations of CAPL (and now Circle K's Director of National Wholesale Fuels, California), would constantly complain to Celusta, "You are old," "We [Circle K and CAPL] are out of date with the business styles today."  "Now that you are getting older, do you plan on retiring soon?" "You're getting too old for this business," "the business is changing, you guys (Celusta and Tom Maloney, Eastern Regional Director of Circle K's National Wholesale Fuels, who was over 50 years of age).

(c) Defendants would pointedly comment to older workers their age. Wilkins then asked Celusta, "Joe, how old are you?" to which Celusta responded, "56." Wilkins then stated, "Joe, you should really start thinking about retiring. You're out of touch.

42

1  We no longer take care of business the old way." Topper stated to
2  Staats, "well, I assume you're not 21 since you worked for SHELL
3  many years but you don't sound 60 either. How old are you?"
4  CAPL's HR department also began to harass Staats by complaining
5  that she "was always in the doctor's office," "asking if there was
6  something wrong with her," and inquiring whether the HR Department
7  needed to schedule Staats' job responsibilities since she was "at
8  the doctors' office all the time."

9          (d) Defendants officers would constantly state that
10  older workers should retire. Wilkins openly harassed Celusta about
11  retiring and said he was "too old for this business." Bonnert told
12  Williams that the company was clearly "seeking younger people" and
13  that the company "was not embracing older employees over 50 for
14  these types of positions (regardless of experience or
15  performance)." Bonnert openly stated that he was under pressure
16  from his superiors (Valencia and Wilkins) to fire older DBMs
17  without sufficient cause and  encouraged Williams to "consider
18  looking outside the company" for advancement opportunities.

19          86. Plaintiffs did not welcome the continued offensive
20  comments and treatment.

21          87.  The wrongful conduct of Defendants subjected
22  Plaintiffs to a hostile work environment and constituted
23  harassment, in violation of the FEHA.

24          88. Defendants' actions, as alleged above, resulted in a
25  work environment which was hostile to Plaintiffs and said hostile
26  environment permeated Plaintiffs' work place, was openly discussed
27  by officers, directors, regional managers, DBMs and was known to
28

43

COMPLAINT

1  each Plaintiff such that these wrongful actions altered the

2  conditions of Plaintiffs' employment.

3          89. In spite of Plaintiffs' repeated complaints the

4  hostile and harassing conduct did not cease and Defendants caused,

5  allowed and failed to prevent a hostile work environment for

6  Plaintiffs.

7          90.  As a result of Defendants' hostile work

8  environment, Plaintiffs were violated in their persons and

9  humiliated, as well as being subjected to severe emotional

10 distress and damage.

11         91. Defendants' discriminatory acts, as detailed above,

12 toward Plaintiff in the treatment, terms and conditions of their

13 employment violated the FEHA.

14         92. As a proximate result of Defendants' discriminatory

15 and retaliatory actions against Plaintiffs, as alleged above,

16 Plaintiffs have been harmed in that Plaintiffs have suffered the

17 loss of the wages, salary, benefits, and additional amounts of

18 money Plaintiffs would have received if Plaintiffs had not been

19 wrongfully discriminated against and retaliated against by

20 Defendants.  As a further proximate result of Defendants'

21 discriminatory actions against Plaintiffs, as alleged above,

22 Plaintiffs have been harmed in that Plaintiffs have suffered the

23 intangible loss of employment-related opportunities.  Also, as a

24 further proximate result of Defendants' discriminatory and

25 retaliatory actions against Plaintiffs, as alleged above,

26 Plaintiffs have been harmed in that Plaintiffs have suffered

27 humiliation, mental anguish, and emotional distress, physical

28 injury and sickness and have been injured in mind and body.

93. The wrongful conduct of Defendants set forth hereinabove was perpetrated upon Plaintiffs intentionally, willfully, fraudulently, in conscious disregard of Plaintiffs' rights and safety and with a callous indifference to the injurious consequences which were substantially certain to occur and was shameful, despicable and deplorable. The wrongful conduct of Defendants set forth hereinabove was perpetrated upon Plaintiffs maliciously, with the intention by Defendants to cause injury to Plaintiffs and was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights or safety of Plaintiffs. The wrongful conduct of Defendants set forth hereinabove was also oppressive in that it was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights. Such despicable conduct was base, vile and contemptible. Plaintiffs are further informed and believe that each business or corporate employer, through its officers, directors and managing agents, and each individual defendant, had advance knowledge of the wrongful conduct, with a conscious disregard of the rights and safety of Plaintiffs, and after becoming aware of their wrongful conduct, each corporate defendant by and through its officers, directors and managing agents, and each individual defendant authorized and ratified the wrongful conduct herein alleged. Therefore, Plaintiffs seek exemplary and punitive damages against Defendants in an amount according to proof.

\\\

\\\

\\\

45

1           **FOURTH CAUSE OF ACTION**

2       **(Hostile Work Environment in Violation of the ADEA,
             Against All Defendants**

3

4           94. Plaintiffs restate and incorporate by

5   reference each and every allegation contained in paragraphs 1

6   through 69, inclusive, as though fully set forth herein.

7           95. Plaintiffs were repeatedly subjected to harassing

8   conduct from the Defendants' managers and officers, including

9   repeated offensive, age-related negative comments from Valencia

10  and Wilkins who were the driving force behind the age

11  discrimination described above.  This discriminatory conduct was

12  pervasive, permeated the workplace, known to each plaintiff, and

13  included, but was not limited to, the following incidents:

14          (a) Defendants openly stated that older DBMs were

15  less desirable. This was told to Regional Directors who ensured

16  that each Plaintiff was made aware of Defendants' position.

17          (b) George Wilkins, then Vice President of

18  Operations of CAPL (and now Circle K's Director of National

19  Wholesale Fuels, California), would constantly complain to

20  Celusta, "You are old," "We [Circle K and CAPL] are out of date

21  with the business styles today."  "Now that you are getting older,

22  do you plan on retiring soon?" "You're getting too old for this

23  business," "the business is changing, you guys (Celusta and Tom

24  Maloney, Eastern Regional Director of Circle K's National

25  Wholesale Fuels, who was over 50 years of age).

26          (c) Defendants would pointedly comment to older workers

27  their age. Wilkins then asked Celusta, "Joe, how old are you?" to

28  which Celusta responded, "56." Wilkins then stated, "Joe, you

46

should really start thinking about retiring. You're out of touch.
We no longer take care of business the old way." Topper stated to
Staats, "well, I assume you're not 21 since you worked for SHELL
many years but you don't sound 60 either. How old are you?"
CAPL's HR department also began to harass Staats by complaining
that she "was always in the doctor's office," "asking if there was
something wrong with her," and inquiring whether the HR Department
needed to schedule Staats' job responsibilities since she was "at
the doctors' office all the time."

        (d)  Defendants officers would constantly state that
older workers should retire. Wilkins openly harassed Celusta about
retiring and said he was "too old for this business." Bonnert told
Williams that the company was clearly "seeking younger people" and
that the company "was not embracing older employees over 50 for
these types of positions (regardless of experience or
performance)." Bonnert openly stated that he was under pressure
from his superiors (Valencia and Wilkins) to fire older DBMs
without sufficient cause and  encouraged Williams to "consider
looking outside the company" for advancement opportunities.

      96. Plaintiffs did not welcome the continued offensive
comments and treatment.

      97.  The wrongful conduct of Defendants subjected
Plaintiffs to a hostile work environment and constituted
harassment, in violation of the ADEA, 29 U.S.C. § 621, et seq.

      98. Defendants' actions, as alleged above, resulted in a
work environment which was hostile to Plaintiffs and said hostile
environment permeated Plaintiffs' work place, was openly discussed
by officers, directors, regional managers, DBMs and was known to

COMPLAINT

1  each Plaintiff such that these wrongful actions altered the
2  conditions of Plaintiffs' employment.
3          99. In spite of Plaintiffs' repeated complaints the
4  hostile and harassing conduct did not cease and Defendants caused,
5  allowed and failed to prevent a hostile work environment for
6  Plaintiffs.
7          100. As a result of Defendants' hostile work
8  environment, Plaintiffs were violated in their persons and
9  humiliated, as well as being subjected to severe emotional
10 distress and damage.
11         101. Defendants' discriminatory acts, as detailed above,
12 toward Plaintiff in the treatment, terms and conditions of their
13 employment violated the ADEA, 29 U.S.C. § 621, et seq.
14         102. As a proximate result of Defendants' discriminatory
15 actions against Plaintiffs, as alleged above, Plaintiffs have been
16 harmed in that Plaintiffs have suffered the loss of the wages,
17 salary, benefits, and additional amounts of money Plaintiffs would
18 have received if Plaintiffs had not been wrongfully discriminated
19 against and retaliated against by Defendants.  As a further
20 proximate result of Defendants' discriminatory actions against
21 Plaintiffs, as alleged above, Plaintiffs have been harmed in that
22 Plaintiffs have suffered the intangible loss of employment-related
23 opportunities.  Also, as a further proximate result of Defendants'
24 discriminatory and retaliatory actions against Plaintiffs, as
25 alleged above, Plaintiffs have been harmed in that Plaintiffs have
26 suffered humiliation, mental anguish, and emotional distress,
27 physical injury and sickness and have been injured in mind and
28 body.

COMPLAINT

103. The wrongful conduct of Defendants set forth hereinabove was perpetrated upon Plaintiffs intentionally, willfully, fraudulently, in conscious disregard of Plaintiffs' rights and safety and with a callous indifference to the injurious consequences which were substantially certain to occur and was shameful, despicable and deplorable. The wrongful conduct of Defendants set forth hereinabove was perpetrated upon Plaintiffs maliciously, with the intention by Defendants to cause injury to Plaintiffs and was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights or safety of Plaintiffs. The wrongful conduct of Defendants set forth hereinabove was also oppressive in that it was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights. Such despicable conduct was base, vile and contemptible. Plaintiffs are further informed and believe that each business or corporate employer, through its officers, directors and managing agents, and each individual defendant, had advance knowledge of the wrongful conduct, with a conscious disregard of the rights and safety of Plaintiffs, and after becoming aware of their wrongful conduct, each corporate defendant by and through its officers, directors and managing agents, and each individual defendant authorized and ratified the wrongful conduct herein alleged. Therefore, Plaintiffs seek exemplary and punitive damages against Defendants in an amount according to proof.

\\\

\\\

\\\

COMPLAINT

## **FIFTH CAUSE OF ACTION**

### **(Retaliation in Violation of the FEHA
Against All Defendants)**

104. Plaintiffs restate and incorporate by reference each and every allegation contained in paragraphs 1 through 69, inclusive, as though fully set forth herein.

105. Defendants engaged in a "pattern and practice" of employment discrimination against Plaintiffs based on their age.

106. When Plaintiffs complained to their supervisors about being denied promotions and treated differently, thereby engaging in the protected activity of making complaints to Defendants' about age discrimination and the differential treatment to which they were subjected, Defendants retaliated against Plaintiffs in response.

107. Specifically, as set forth above, after the complained, Plaintiffs were retaliated against in that Caldrone and Celusta weres denied the opportunity to compete for other promotions then terminated; Staats was denied the opportunity to apply for promotions, was subjected to manufactured complaints in her personnel file about her doctors appointments, stripped of her high-performing station, then received a sudden, uncharacteristic negative personnel review; and Williams was denied the opportunity to apply for promotions, demoted by being stripped of her high-performing stations, was subjected to manufactured complaints in her personnel file falsely claiming that she was inconvenienced another employee and was hostile and harassing, then received a sudden, uncharacteristic negative personnel review.

\\\
\\\

COMPLAINT

1        108. Defendants' retaliatory acts, as detailed above,

2   toward Plaintiffs in the treatment, terms and conditions of his

3   employment violated the FEHA.

4        109. As a proximate result of Defendants' discriminatory

5   and retaliatory actions against Plaintiffs, as alleged above,

6   Plaintiffs have been harmed in that Plaintiffs have suffered the

7   loss of the wages, salary, benefits, and additional amounts of

8   money Plaintiffs would have received if Plaintiffs had not been

9   wrongfully discriminated against and retaliated against by

10  Defendants.  As a further proximate result of Defendants'

11  discriminatory actions against Plaintiffs, as alleged above,

12  Plaintiffs have been harmed in that Plaintiffs have suffered the

13  intangible loss of employment-related opportunities.  Also, as a

14  further proximate result of Defendants' discriminatory and

15  retaliatory actions against Plaintiffs, as alleged above,

16  Plaintiffs have been harmed in that Plaintiffs have suffered

17  humiliation, mental anguish, and emotional distress, physical

18  injury and sickness and have been injured in mind and body.

19       110. The wrongful conduct of Defendants set forth

20  hereinabove was perpetrated upon Plaintiffs intentionally,

21  willfully, fraudulently, in conscious disregard of Plaintiffs'

22  rights and safety and with a callous indifference to the injurious

23  consequences which were substantially certain to occur and was

24  shameful, despicable and deplorable.  The wrongful conduct of

25  Defendants set forth hereinabove was perpetrated upon Plaintiffs

26  maliciously, with the intention by Defendants to cause injury to

27  Plaintiffs and was despicable conduct carried on by Defendants

28  with a willful and conscious disregard of the rights or safety of

51

1  Plaintiffs.   The wrongful conduct of Defendants set forth

2  hereinabove was also oppressive in that it was despicable conduct

3  that subjected Plaintiffs to cruel and unjust hardship in

4  conscious disregard of Plaintiffs' rights.   Such despicable

5  conduct was base, vile and contemptible.   Plaintiffs are further

6  informed and believe that each business or corporate employer,

7  through its officers, directors and managing agents, and each

8  individual defendant, had advance knowledge of the wrongful

9  conduct, with a conscious disregard of the rights and safety of

10  Plaintiffs, and after becoming aware of their wrongful conduct,

11  each corporate defendant by and through its officers, directors

12  and managing agents, and each individual defendant authorized and

13  ratified the wrongful conduct herein alleged.   Therefore,

14  Plaintiffs seek exemplary and punitive damages against Defendants

15  in an amount according to proof.

16  **SIXTH CAUSE OF ACTION**

17  **(Retaliation in Violation of the ADEA
    Against All Defendants)**

18

19  111. Plaintiffs restate and incorporate by

20  reference each and every allegation contained in paragraphs 1

    through 69, inclusive, as though fully set forth herein.
21

22  112. Defendants engaged in a "pattern and practice" of

23  employment discrimination against Plaintiffs based on their age.

24  113. When Plaintiffs complained to their supervisors

25  about being denied promotions and treated differently, thereby

    engaging in the protected activity of making complaints to
26
    Defendants' about age discrimination and the differential
27
    treatment to which they were subjected, Defendants retaliated
28
    against Plaintiffs in response.

52

114. Specifically, as set forth above, after the complained, Plaintiffs were retaliated against in that Caldrone and Celusta weres denied the opportunity to compete for other promotions then terminated; Staats was denied the opportunity to apply for promotions, was subjected to manufactured complaints in her personnel file about her doctors appointments, stripped of her high-performing station, then received a sudden, uncharacteristic negative personnel review; and Williams was denied the opportunity to apply for promotions, demoted by being stripped of her high-performing stations, was subjected to manufactured complaints in her personnel file falsely claiming that she was inconvenienced another employee and was hostile and harassing, then received a sudden, uncharacteristic negative personnel review.

115. Defendants' retaliatory acts, as detailed above, toward Plaintiffs in the treatment, terms and conditions of his employment violated the ADEA.

116. As a proximate result of Defendants' discriminatory and retaliatory actions against Plaintiffs, as alleged above, Plaintiffs have been harmed in that Plaintiffs have suffered the loss of the wages, salary, benefits, and additional amounts of money Plaintiffs would have received if Plaintiffs had not been wrongfully discriminated against and retaliated against by Defendants.  As a further proximate result of Defendants' discriminatory actions against Plaintiffs, as alleged above, Plaintiffs have been harmed in that Plaintiffs have suffered the intangible loss of employment-related opportunities.  Also, as a further proximate result of Defendants' discriminatory and retaliatory actions against Plaintiffs, as alleged above,

53

1  Plaintiffs have been harmed in that Plaintiffs have suffered

2  humiliation, mental anguish, and emotional distress, physical

3  injury and sickness and have been injured in mind and body.

4        117. The wrongful conduct of Defendants set forth

5  hereinabove was perpetrated upon Plaintiffs intentionally,

6  willfully, fraudulently, in conscious disregard of Plaintiffs'

7  rights and safety and with a callous indifference to the injurious

8  consequences which were substantially certain to occur and was

9  shameful, despicable and deplorable.  The wrongful conduct of

10  Defendants set forth hereinabove was perpetrated upon Plaintiffs

11  maliciously, with the intention by Defendants to cause injury to

12  Plaintiffs and was despicable conduct carried on by Defendants

13  with a willful and conscious disregard of the rights or safety of

14  Plaintiffs.  The wrongful conduct of Defendants set forth

15  hereinabove was also oppressive in that it was despicable conduct

16  that subjected Plaintiffs to cruel and unjust hardship in

17  conscious disregard of Plaintiffs' rights.  Such despicable

18  conduct was base, vile and contemptible.  Plaintiffs are further

19  informed and believe that each business or corporate employer,

20  through its officers, directors and managing agents, and each

21  individual defendant, had advance knowledge of the wrongful

22  conduct, with a conscious disregard of the rights and safety of

23  Plaintiffs, and after becoming aware of their wrongful conduct,

24  each corporate defendant by and through its officers, directors

25  and managing agents, and each individual defendant authorized and

26  ratified the wrongful conduct herein alleged.  Therefore,

27  Plaintiffs seek exemplary and punitive damages against Defendants

28  in an amount according to proof.

54

### SEVENTH CAUSE OF ACTION

**(Violation of Public Policy
Against All Defendants)**

118. Plaintiffs restate and incorporate by reference each and every allegation contained in paragraphs 1 through 69, inclusive, as though fully set forth herein.

119. Defendants' actions, as alleged above, constitute a violation of the public policy of this State, and of the States of Pennsylvania, Ohio and Florida in that discrimination on the basis of age, retaliation, and in the cases of Caldrone and Celusta, the termination of Plaintiffs employment, contravene specific constitutional and statutory provisions, which prohibit age discrimination, retaliation, and termination of the employment of a person who complains of such prohibited conduct, including the provisions of the FEHA and the ADEA which expressly forbid such conduct. The wrongful failure to promote Plaintiffs in retaliation further violates California's whistleblower protections (Labor Code section 1102.5), and the whistleblower protections of the states of Pennsylvania, Ohio and Florida which prohibit discrimination and retaliation against employees who complain about or protest unlawful or illegal activities in the workplace.

120. As a proximate result of Defendants' discriminatory and retaliatory actions against Plaintiffs, as alleged above, Plaintiffs have been harmed in that Plaintiffs have suffered the loss of the wages, salary, benefits, and additional amounts of money Plaintiffs would have received if Plaintiffs had not been wrongfully discriminated against and retaliated against by Defendants.  As a further proximate result of Defendants' discriminatory actions against Plaintiffs, as alleged above,

55

1  Plaintiffs have been harmed in that Plaintiffs have suffered the

2  intangible loss of employment-related opportunities.  Also, as a

3  further proximate result of Defendants' discriminatory and

4  retaliatory actions against Plaintiffs, as alleged above,

5  Plaintiffs have been harmed in that Plaintiffs have suffered

6  humiliation, mental anguish, and emotional distress, physical

7  injury and sickness and have been injured in mind and body.

8           121. The wrongful conduct of Defendants set forth

9  hereinabove was perpetrated upon Plaintiffs intentionally,

10 willfully, fraudulently, in conscious disregard of Plaintiffs'

11 rights and safety and with a callous indifference to the injurious

12 consequences which were substantially certain to occur and was

13 shameful, despicable and deplorable.  The wrongful conduct of

14 Defendants set forth hereinabove was perpetrated upon Plaintiffs

15 maliciously, with the intention by Defendants to cause injury to

16 Plaintiffs and was despicable conduct carried on by Defendants

17 with a willful and conscious disregard of the rights or safety of

18 Plaintiffs.  The wrongful conduct of Defendants set forth

19 hereinabove was also oppressive in that it was despicable conduct

20 that subjected Plaintiffs to cruel and unjust hardship in

21 conscious disregard of Plaintiffs' rights.  Such despicable

22 conduct was base, vile and contemptible.  Plaintiffs are further

23 informed and believe that each business or corporate employer,

24 through its officers, directors and managing agents, and each

25 individual defendant, had advance knowledge of the wrongful

26 conduct, with a conscious disregard of the rights and safety of

27 Plaintiffs, and after becoming aware of their wrongful conduct,

28 each corporate defendant by and through its officers, directors

COMPLAINT

1 and managing agents, and each individual defendant authorized and

2 ratified the wrongful conduct herein alleged.  Therefore,

3 Plaintiffs seek exemplary and punitive damages against Defendants

4 in an amount according to proof.

5          WHEREFORE, Plaintiffs prays for relief as set forth

6 hereafter:

7 As to the First, Second, Third, Fourth, Fifth, Sixth, and Seventh

8 Causes of Action:

9          1.    Damages according to proof but believed to be in

10 excess of $1,000,000.00;

11          2.    Attorneys' fees;

12          3.    Costs;

13          4.    Punitive damages; and

14          5.    Such other and further relief as the court deems

15 just and proper.

16

17 **PLAINTIFFS HEREBY DEMAND A JURY TRIAL**

18

19 DATED: December 22, 2020          McMILLAN & HERRELL
                                    SHELLY D. McMILLAN
20                                  MATTHEW B. HERRELL

21
                                    By: /s/ **Shelly D. McMillan**
22                                      Shelly D. McMillan
                                        Attorneys for Plaintiff,
23                                  BRIAN CALDRONE, GALIA WILLIAMS,
                                    JOSEPH CELUSTA, AND KATHLEEN STAATS
24

25

26

27

28

COMPLAINT